UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
TRUSTEES OF THE PLUMBERS LOCAL UNION NO. 1 WELFARE FUND, TRADE EDUCATION FUND, AND 401(K) SAVINGS PLAN,

Plaintiffs,

-against-

SPRAY IN PLACE SOLUTIONS, LLC and ATLANTIC SPECIALTY INSURANCE COMPANY,

Defendants.
---------------------------------------------------------------X

Case No.: 1:24-cv-2568 (KAM) (PK)

**DEFENDANTS' RULE 56.1 COUNTERSTATEMENT AND ADDITIONAL MATERIAL FACTS IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT**

Defendants respond to Plaintiffs' Rule 56.1 Statement (ECF 66-1) as follows. Each numbered assertion is reproduced below, followed immediately by the response. Admissions are for purposes of the anticipated motions only. Additional material facts follow consecutively at paragraphs 62–80. The filed declarations and exhibits retain their ECF citations; the separate Martino affidavit and project agreement are identified by date and title. The meaning and effect of the agreements are questions for the Court.

1. Plaintiffs Trustees of the Plumbers Local Union No. 1 Welfare Fund, Trade Education Fund, and 401(k) Savings Plan (collectively, the "Local 1 Funds") are the Trustees of multiemployer labor-management trust funds organized and operated pursuant to various collective bargaining agreements in accordance with section 302(c) of the LMRA, 29 U.S.C. § 186(c) and ERISA. The Trustees are fiduciaries of the ERISA Funds within the meaning of section 3(21) of ERISA, 29 U.S.C. § 1002(21). The Funds are administered at 50-02 Fifth Street, Second Floor, Long Island City, New York 11101. See Declaration in Support of Rebecca W. Richardson ("Richardson Decl."), ¶ 3; Declaration in Support of Wendy Salvatierra ("Salvatierra Decl."), ¶ 4.

**Response:**

2. Plaintiff Plumbers Local Union No. 1 Welfare Fund is the designated Collection Agent for Local Union No. 1 of the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada (the "Union") and the Plumbing Industry Promotion Fund of New York City. The Union is, and at all relevant times was, a labor organization within the meaning of section 301 of the LMRA, 29 U.S.C. § 185. The Union

represents, and at all relevant times represented, employees in an industry affecting commerce as defined in section 502 of the LMRA, 29 U.S.C. § 142. See Salvatierra Decl. ¶ 2; Declaration in Support of Rebecca W. Richardson ("Richardson Decl.") ¶ 4.

**Response:**

3. Defendant, Spray in Place Solutions, LLC ("SIPS") is a foreign limited liability company organized under the laws of the State of Florida and duly authorized to conduct business in the City and State of New York as an employer within the meaning of sections 3(5) and 515 of ERISA, 29 U.S.C. §§ 602(5) and 1145, and was and is an employer in an industry affecting commerce within the meaning of section 301 of the Taft-Hartley Act, 29 U.S.C. § 185. SIPS maintains its principal place of business at 45 Knickerbocker Avenue, Suite 1, Bohemia, New York 11716. Richardson Decl., ¶ 5.

**Response:**

4. The New York Department of State Division of Corporations lists "THE LLC" with an address of 45 Knickerbocker Avenue, Suite 1, Bohemia, New York 11716, as the post office address to which the Secretary of State shall mail a copy of any process against the Company served upon the Secretary of State by personal delivery. See Richardson Decl. ¶ 6, Ex. 1; Defendant's Answer to Complaint ("Answer") (Docket No. 13) ¶ 7.

**Response:**

5. Upon information and belief, Jeffrey Sausele is the president of SIPS and resides at 554 Boxwood Drive, Shirley, New York 11967. See Richardson Decl. ¶ 7.

**Response:**

6. Upon information and belief, SIPS performs "trenchless pipe restoration" using "spray-in-place pipe (SIPP)" technology to "rehabilitate" "like new pipe with an added 75 year engineered life expectancy" and has spent "30 years in the plumbing industry." See Richardson Decl. ¶ 8, Ex. 2.

**Response:**

7. Defendant Atlantic Specialty Insurance Company ("ASIC," together with SIPS, the "Defendants") is a corporation incorporated under the laws of the State of New York and authorized to do business within the insurance industry in the State of New York. ASIC has its principal place of business located at One State Street Plaza, Fl 31, New York, NY 10004. See Richardson Decl. ¶ 9; Answer ¶ 9.

**Response:**

8. On or about November 26, 2019, SIPS executed a renewal agreement as a signatory to the Union's Mechanical Equipment and Service Division Collective Bargaining Agreement detailing the terms and conditions for certain mechanical equipment servicing work within the City of New York covering the period October 1, 2019 through December 31, 2022 (the "MES Agreement"). See Salvatierra Decl. ¶ 5, Ex. 1.

**Response:**

9. The MES Agreement requires that any entity bound to the agreement remit contributions to the Funds for all hours of covered work performed by its employees. See Salvatierra Decl. ¶ 6, Ex. 2, Arts. III, IV.

**Response:**

10. The MES Agreement provides that "[a]ny entity wishing to abrogate this Agreement must notify both the Association and the Union in writing by regular and express delivery mail a minimum of one hundred and eighty (180) days prior to the expiration date of this Agreement." See Salvatierra Decl. ¶ 7, Ex. 2, Article XVI.

**Response:**

11. The 2019-2022 MES CBA renewal agreement states, "[t]he undersigned Plumbing Contractor and individual signatory agree that the Collective Bargaining Agreement to which they shall be bound shall continue in effect until and including December 31, 2022 and during each year thereafter unless on or before the thirtieth (30th) day of June 2022, on or before the thirtieth (30th) day of June of any year thereafter, written notice of termination or proposed changes shall have been served by either party on the other party via certified or registered mail." See Salvatierra Decl. ¶ 8, Ex. 1.

**Response:**

12. On June 16, 2022, the Union informed the Funds that SIPS served written notice of intent to abrogate and the Union acknowledged this request on June 29, 2022. As a result, SIPS remained bound to the 2019-2022 MES Agreement through the expiration of its written term—December 31, 2022. See Salvatierra Decl. ¶ 9, Ex. 11.

**Response:**

13. Accordingly, at all relevant times, Defendant was bound to a CBA with the Union. See Salvatierra Decl. ¶ 10.

**Response:**

14. Each of the individual Plaintiff Funds are governed by a trust agreement. See Salvatierra Decl. ¶ 11, Exs. 3, 4, and 5.

**Response:**

15. The Trust Agreements are incorporated by reference in the CBA and are binding upon SIPS. See Salvatierra Decl. ¶ 12, Ex. 2, Art. XV.

**Response:**

16. The Local 1 Trust Agreements permit the Local 1 Funds to establish policies, rules, and procedures to collect unpaid contributions to the Funds. See Salvatierra Decl. ¶ 13, Exs. 3-5, Art. VI, Sec. 6.

**Response:**

17. Pursuant thereto, at a meeting held on June 24, 2021, the Trustees of the Local 1 Funds adopted a Policy for Collection of Delinquent Fringe Benefit Employer Contributions (the "Local 1 Fringe Benefit Collection Policy") and Joint Policy for Collection of Delinquent Employee Contributions and Participant Amounts ("401k Collection Policy," together with the Local 1 Fringe Benefit Collection Policy, the "Local 1 Collection Policies"). See Salvatierra Decl. ¶ 14, Exs. 6(a), (b); 7(a), (b).

**Response:**

18. The CBAs, Trust Agreement, and Collection Policies, require SIPS to submit reports ("remittance reports") to the Funds detailing the number of hours of all plumbing work and other specified work performed on behalf Defendant within the trade and geographical jurisdiction of the Union ("Covered Work") performed by its employees, as well as the corresponding benefit contributions to the Funds and to remit other specified amounts, including Union dues withheld from its employees' pay to the Funds in connection with Covered Work, no later than the twentieth (20th) day of the month following the month in which the hours were worked. See Salvatierra Decl. ¶ 15, Ex. 2, Arts. II, III, IV, VIII-X; Exs. 3-5, Art. V I; Exs. 6-7, Art. II.

**Response:**

19. According to the CBA, "[c]ommencing with the effective dates of this Agreement [October 1, 2019], the Employer agrees to pay to and on behalf of his/her Journeymen the rates set forth in Table No. 1. The Employer also agrees to pay to and on behalf of the Helpers the rates set forth in Table No. 2." See Salvatierra Decl. ¶ 16, Ex. 2, Art. III. The Tables referenced explicitly include hourly wages and hourly fringes as a compensation package. Id.

**Response:**

20. The CBA further states, "[t]he Employer agrees, in addition to wages, to pay on behalf of each Journeyman and Helper the fringe benefits set forth in Tables 1 and 2." Id. ¶ 17, Ex. 2, Art., Art. IV.

**Response:**

21. Covered Work defined under the terms of the CBA includes but is not limited to "Any repair and/or replacement of the present plumbing system at commercial sites and/or residential buildings." See id. ¶ 18, Ex. 2, Art. II, Rule 7(B).

**Response:**

22. Contributions are calculated by taking the number of hours of Covered Work performed during the reporting period and multiplying said hours by the applicable contribution rates set forth in the CBAs. See id. ¶ 19, Ex. 2, Arts. III-IV.

**Response:**

23. The CBAs and the Collection Policies require SIPS to furnish its books and payroll records when requested by the Funds for the purpose of conducting an audit to ensure compliance with its contribution obligations to Plaintiffs. See Salvatierra Decl., Ex. 2, Art. XIV; Ex. 6, Art. IV; Ex. 7, Art. V. The CBAs specifically state, "[SIPS] agrees to keep its labor payrolls and job and time books and comprehensive books available for joint inspection by representatives of the Union and the Association, and the accountant of the Joint Plumbing Industry Board, who shall be permitted to examine same to. . . check the Fringe Benefits. . . ." See id. ¶ 20, Ex 2, Art. XIV.

**Response:**

24. The Collection Policies also state, "The Funds shall conduct a dual audit policy comprised of a random selection process as well as a targeted system." See Salvatierra Decl. ¶ 21, Ex. 6, Art. IV, ¶ 1; Ex. 7, Art. V, ¶ 1. The Collection Policies state further that, "The Board and the Collections Committee, or its designees, shall have discretion in determining how many employers shall be randomly audited and which employers will be targeted for audit in each year." Id.

**Response:**

25. Under the documents and instruments governing the Local 1 Funds, including the CBAs, Trust Agreements, and Local 1 Collection Policies, employers whose contributions are delinquent are liable to the Local 1 Funds for the amount of delinquent contributions, interest thereon at the rate of ten percent (10%) per annum, plus liquidated damages equal to twenty percent (20%) of the delinquent contributions, and attorneys' fees and costs. See id. ¶ 22, Ex. 2, Art. VI; Exs. 3-5, Art. VI, Sec. 6; Ex. 6, Art. 2, ¶ 6; Ex. 7, Art. III.B.2.

**Response:**

26. On or about July 1, 2020, ASIC issued Bond No. 810002719 (the "Bond") guaranteeing the payment of all benefits owed in connection with all Covered Work performed by SIPS' employees to the Funds up to the amount of $7,000. See Salvatierra Decl. ¶ 37, Ex. 8.

**Response:**

27. In or around February 18, 2021, ASIC issued a rider to be attached to the Bond (the "Rider") which increased the amount of the Bond to $21,000. The Rider was received by the funds on or about March 5, 2021. See Salvatierra Decl. ¶ 38, Ex. 9.

**Response:**

28. The terms of the Bond stated that the Bond was to remain valid unless and until ASIC notified the Funds of the cancelation of the Bond via certified mail with ninety (90) days' notice. See Salvatierra Decl. ¶ 39, Ex. 8.

**Response:**

29. On or about January 2024, the Funds received a notice of cancelation from ASIC via first class mail which stated that the Bond would be canceled on April 8, 2024. See Salvatierra Decl. ¶ 40, Ex. 10.

**Response:**

30. Plaintiffs, pursuant to the CBA and the Collection Policies, on or about July 21, 2022, engaged their independent auditors at the accounting firm Schultheis & Panettieri LLP ("S&P" or the "Auditor") to conduct a target payroll audit of SIPS for the time period September 1, 2020 through June 30, 2022 (the "Audit"). Salvatierra Decl., ¶ 23; Brusseau Decl. ¶ 3.

**Response:**

31. Based on the Auditor's analysis and comparison of the hours that Defendant's employees performed Covered Work during the period of September 1, 2020 through June 30, 2022, the amount of hours of Covered Work that Defendant reported to Plaintiffs during that period, and the amount of contributions that Defendant remitted to Plaintiff during that period, the auditor issued a report reflecting that Defendant owed a total delinquency to Plaintiffs of at least $46,465.17 in contributions, interest and liquidated damages thereon; ASB-C findings of $3,415.69, and lost earnings of $232.61, interest and liquidated damages thereon; and audit costs of $3,635.50, plus the Plaintiffs' attorneys' fees and costs. See Salvatierra Decl. ¶ 24; Brusseau Decl., ¶¶ 5-7, Ex. 1.

**Response:**

32. The Auditor created a preliminary report that was issued to the Defendant on May 16, 2023. See Brusseau Decl. ¶ 13, Exs. 3, 4.

**Response:**

33. Upon learning that SIPS' bond securing payments owed to the Funds would be terminated effective April 8, 2024, at a Collections Committee meeting on January 8, 2024, the Trustees of the Funds directed S&P to change the target audit to a closeout audit and expand the period to cover September 1, 2020 through December 31, 2023 (the "Expanded Audit")[1]. See Salvatierra Decl. ¶ 25; Brusseau Decl., ¶ 14. [1] The parties in this litigation eventually stipulated that the Expanded Audit would go through December 31, 2022. Brusseau Decl. ¶ 4; Richardson Decl. ¶ 16.

**Response:**

34. SIPS refused to comply with the Expanded Audit. See Salvatierra Decl. ¶ 26; Brusseau Decl. ¶ 15; Richardson Decl. ¶¶ 15, 16.

**Response:**

35. The Plaintiffs brought this litigation to pursue the amounts identified in the Initial Audit, to compel SIPS' compliance with the Expanded Audit, and for the unknown amounts identified in the Expanded Audit. See Richardson Decl. ¶ 11.

**Response:**

36. Starting in September 2024, the Parties—Plaintiffs through former collections counsel—negotiated to obtain a stipulation governing the production of documents, including documents related to the Expanded Audit. See Richardson Decl. ¶ 14.

**Response:**

37. After extensive negotiations, on March 25, 2025, Plaintiffs and SIPS signed a stipulation for the Production of Audit Documents, under which SIPS was obligated to produce all outstanding documents, submit to the Expanded audit from July 1, 2022 through December 31, 2022, and pay any undisputed amounts owed. See Richardson Decl. ¶ 15.

**Response:**

38. On April 2, 2025, the Parties filed a Stipulation for the Production of Audit Documents for the Defendant SIPS to comply with the Expanded Audit for the period September 1, 2020 through December 31, 2022. See Richardson Decl. ¶ 16, Ex. 3.

**Response:**

39. On August 4, 2025, the Funds Auditors received the remaining documents needed to complete the Expanded Audit covering the period through December 31, 2022. See Brusseau Decl. ¶ 15.

**Response:**

40. Based on the Auditor's analysis and comparison of the hours that Defendant's employees performed Covered Work during the period of September 1, 2020 through December 31, 2022, the amount of hours of Covered Work that Defendant reported to Plaintiffs during that period, and the amount of contributions that Defendant remitted to Plaintiff during that period, the Expanded Audit Report reflected that Defendant owed a total delinquency to Plaintiffs of at least $136,746.57 consisting of i) contributions owed to the Local 1 Funds totaling $69,017.32; ii) interest on unpaid contributions to the Local 1 Funds totaling $27,170.44[2]; iii) liquidated damages owed to the Local 1 Funds totaling $13,573.05; (iv) contributions owed to the Union totaling $5,497.45; and (v) interest owed thereon totaling $2,192.27; (vi) ASB-C findings of $6,386.31, and lost earnings of $938.53, interest thereon of $2,351.78, liquidated damages of $1,464.97; and audit costs of $8,154.45[3]. Brusseau Decl., ¶¶ 16-18; id., Ex. 2; see also Salvatierra Decl. ¶¶ 28, 36, Ex. 12. [2] The interest as reflected in the Final Report dated August 26, 2025 is less than the interest calculated for the purpose of summary judgment due to the accumulation of additional interest from the date on which the Final Report was issued and accounting for payments made to date for which interest was only calculated through the date of that payment. [3] The audit costs have increased since the date on which the Final Report was issued due to additional work by the auditor as a result of SIPS providing additional documentation concerning the audit findings during the course of this litigation.

**Response:**

41. The Auditor noted that in discussions with SIPS, the employer contact stated that no benefits were reported for certain employees due to purported issues SIPS was having with the Funds' remittance system. See Brusseau Decl. ¶ 16. The Fund was never made aware of any issues with its remittance system during the Audit Period, either by SIPS or any other contributing employer, and only has a record of a failed login attempt by SIPS due to an incorrect password that was addressed the same day any time it occurred. The Funds received remittance reports without issue from other contributing employers and from SIPS throughout the Audit Period. Salvatierra Decl., ¶ 29.

**Response:**

42. The Auditor created a report summarizing its findings of the 2018-2022 Audit ("Expanded Audit Report"). Brusseau Decl. ¶ 22; id., Ex. 2; Salvatierra Decl. ¶ 30.

**Response:**

43. On August 12, 2025, after conducting the exit interview, S&P sent draft findings to SIPS. See Brusseau Decl. ¶ 19, Exs. 9, 10.

**Response:**

44. Receiving no exceptions to the draft findings, on or around August 26, 2025, S&P sent SIPS a preliminary audit report, providing 10 days from the date of the preliminary audit report to object in writing to the Auditor's findings. See Brusseau Decl. ¶ 20, Exs. 11, 12.

**Response:**

45. S&P received no written objections to the Auditor's findings. Brusseau Decl. ¶ 21.

**Response:**

46. On September 12, 2025, S&P issued a final audit report to SIPS. See Brusseau Decl. ¶ 23, Exs. 2, 13; Salvatierra Decl. ¶ 31.

**Response:**

47. Pursuant to the Collection Policies that govern the Funds, the cover letter transmitting the revised final Audit Report described in the preceding paragraph instructed SIPS to pay the entire amount within 10 days of the date of the letter. See Brusseau Decl., ¶ 24, Ex. 13.

**Response:**

48. No payment was made towards the audit within 10 days of the date of the letter. See Salvatierra Decl. ¶ 32; See Brusseau Decl. ¶ 25.

**Response:**

49. From April 2, 2025 when the Parties entered the Stipulation for Production of Audit Documents for the Defendants to comply with the Expanded Audit through February 2, 2026, the Plaintiffs worked tirelessly to obtain Defendants' compliance with the fully executed agreed-upon stipulation. The final requirement of the parties' Stipulation for the Production of Audit Documents was met, in that payment of the undisputed amounts owed to Plaintiffs was made and confirmed received by the Plaintiffs, on February 2, 2026. See Richardson Decl. ¶ 17. On February 2, 2026, pursuant to the March 25, 2025 stipulation between the Parties, SIPS paid the undisputed amounts in the amount of $12,727.60. See Salvatierra Decl. ¶ 33.

**Response:**

50. In April of 2026, the Auditors received additional documentation from Fund Counsel that was provided by SIPS' counsel that detailed the time activities of SIPS further. The Auditors reviewed this time detail to determine whether any findings could be removed from the Expanded Audit as findings that were attributable to hours of work performed outside the state

of New York and therefore outside the geographical jurisdiction of Covered Work under the applicable CBA. See Salvatierra Decl. ¶ 34; See Brusseau Decl. ¶ 26.

**Response:**

51. Pursuant to this review, the Auditors identified $27,199.49 of findings and related costs that could be removed from the Expanded Audit. See Salvatierra Decl. ¶ 35, Ex. 12; Brusseau Decl. ¶ 27.

**Response:**

52. Therefore, the remaining amounts due to the Local 1 Funds pursuant to the Audit less amounts reduced and recovered are $158,553.96 consisting of: $69,017.32 in contributions owed to the Local 1 Funds, interest owed on the total Local 1 Funds contribution amount pursuant to the Audit, updated through October 12, 2026 and accounting for payments made to date, of $30,776.79, liquidated damages thereon of $13,803.46; delinquent contributions owed to the Union totaling $5,497.45, interest thereon totaling $2,450.10, and liquidated damages thereon totaling $1,099.49; and ASB-C findings of $6,386.31, lost earnings of $938.53, interest thereon of $2,351.78, and liquidated damages of $1,464.97; administrative fees of $2,000, and audit costs of $11,382.35; less the $12,727.60 already recovered and the $27,199.49 in findings removed from the Expanded Audit as being contributions and associated interest and liquidated damages attributable to hours of work performed outside the geographical jurisdiction of Local Union No. 1. See Salvatierra Decl. ¶ 36, Ex. 12. SIPS also owes the Local 1 Funds attorneys' fees of $51,312.50. See Richardson Decl. ¶ 27, Ex. 4.

**Response:**

53. When an employer fails to pay all contributions when due, including all amounts owed to the Local 1 Funds and all entities for which the Local 1 Funds act as a collections agent, the CBAs and Local 1 Fund Collection Policies impose interest at the rate of ten percent (10%) per annum (compounded annually), plus liquidated damages of twenty percent (20%) of the amount owing, plus all reasonable audit and accounting expenses, attorneys' fees, disbursements, and court costs. See Salvatierra Decl. ¶ 41, Ex. 2, Art. VI; Exs. 3-5, Art. VI, Sec. 6; Ex. 6(a), Art. II ¶ 6; Ex. 7(a), Art. III.B.2. Interest is calculated from the due date to the date of payment. Id. at Exs. 3-5, Art. VI. Further, the Funds are entitled to an assessment of an administrative fee of $100 for every instance in which an employer fails to submit contributions. See id. at Ex. 6, Art. II ¶ 6.

**Response:**

54. Accordingly, calculated through October 12, 2026, SIPS is liable to the Local 1 Funds for interest on the delinquent contributions (absent interest on ASB-C findings) for the period September 1, 2020 through December 31, 2022, at the rate of ten percent (10%) per annum (compounded annually) for a total of $33,226.89 and liquidated damages calculated as twenty

percent (20%) of the principal delinquency for liquidated damages totaling $14,902.95. See Salvatierra Decl. ¶ 42, Ex. 12.

**Response:**

55. Specifically, interest is calculated by multiplying the contributions due per month by the annual interest rate of ten percent (10%) as provided for in the CBA and Local 1 Fund Collection Policies and then dividing that figure by 365 to yield the daily interest rate. For example, for December 2021, the estimated contributions to the Local 1 Funds of $2,065.46 are multiplied by ten percent (10%) interest rate to yield a total yearly interest of $206.55. That figure is then divided by 365 to render the daily interest rate of $0.57. The daily interest rate is then multiplied by the number of days the contributions are late or have been paid late. Here, December 2021 contributions were due on January 20, 2022. Since December 2021 contributions remain outstanding, interest is calculated through the present date, October 12, 2026; therefore, December 2021 contributions are 1,726 days late. The daily interest of $0.57 multiplied by 1,726 days renders interest of $983.82 on December 2021 contributions. This calculation was conducted for each and every month that contributions were owed from September 1, 2020 through December 31, 2022 for the Local 1 Funds and the Union Assessments the Local 1 Funds act as collections agent for. As detailed above, the Local 1 Funds have recovered $12,727.60 in contributions to date. When amounts were received, they were applied to the oldest principal delinquent contributions and interest was calculated through the date payment was received for those contributions. Therefore, the amounts received from SIPS, as detailed in paragraph 33 of the Declaration in Support of Wendy Salvatierra, were applied to the contributions for September 2020 through a portion of December 2020 and as the amounts were received by the Funds on February 2, 2026, interest on those contributions was calculated through that date. The interest was calculated through the date of service of the Plaintiffs' Motion for Summary Judgment for any contributions that remain outstanding, including the remaining amounts owed for December 2020 contributions. See Salvatierra Decl. ¶ 43, Ex. 12.

**Response:**

56. As set forth in the CBA, the Collection Policies, and in Section 502(g)(2) of the Employee Retirement Income Security Act, 29 U.S.C. § 1132(g)(2), Plaintiffs are entitled to recover reasonable attorneys' fees and costs incurred in collecting any unpaid contributions from a delinquent employer. Salvatierra Decl. ¶ 44, Ex. 2, Art. VI; Exs. 3-5, Art. VI, Sec. 6; Ex. 7(a), ¶ 6; Ex. 8(a), Art. III.B.2.

**Response:**

57. Plaintiffs have incurred reasonable attorneys' fees and costs of $51,312.50 in connection with collecting the delinquent contributions underlying this action. See Richardson Decl., ¶¶ 18-21; 23-27; Ex. 4.

**Response:**

58. Discovery in this case has been extensive and nearly every step of the case has been delayed or drawn out unnecessarily by the Defendants and or their counsel. Richardson Decl., ¶ 18.

**Response:**

59. Throughout the litigation, counsel for SIPS has been dilatory in responding to the Plaintiffs and to the Court, in at least one instance forcing the Court to issue a show cause Order. Plaintiffs' counsel has been forced to follow up countless times and seek Court intervention on multiple occasions due to violated court orders or a failure to obtain Defendants' response or consent to some of the most basic filings in this case. This behavior created unnecessary disputes and further motions practice that was unwarranted in this case, especially considering the proportional needs of the case. Richardson Decl., ¶ 19.

**Response:**

60. As shown on the docket, Plaintiffs incurred unnecessary legal fees in this case that were reasonable given the extent of motion practice and discovery Plaintiffs were required to participate in to obtain Defendants' compliance and participation throughout this litigation. Richardson Decl., ¶ 20.

**Response:**

61. Based on the Audit, interest, liquidated damages calculations, and Plaintiffs' attorneys' fees and costs incurred in connection with this action, Defendant owes Plaintiff the sum of at least $158,553.96 , consisting of: a. Remaining contributions owed to the Local 1 Funds totaling $69,017.32 for the period September 1, 2020 through December 31, 2022; b. Interest on the total Fund contribution delinquency at the rate of ten percent (10%) per annum for interest totaling $30,776.79; c. Liquidated damages of twenty percent (20%) of the total Fund contribution delinquency for liquidated damages totaling $13,803.46; d. Delinquent contributions to the Union owed between September 1, 2020 through December 31, 2022 totaling $5,497.45; e. Interest on the total Union contribution delinquency at the rate of 10% per annum for interest totaling $2,450.10; f. Liquidated damages of twenty percent (20%) of the total Union delinquency for liquidated damages totaling $1,099.49; g. ASB-C delinquencies of $6,386.31; h. Lost earnings of $938.53; i. Interest on the ASB-C findings and lost earnings of $2,351.78 and liquidated damages on same of $1,464.97; j. Audit costs of $11,382.35; k. Attorneys' fees and costs totaling $51,312.50 as detailed in the Declaration of Rebecca W. Richardson; l. Administrative Fees of $2,000; m. Less $12,727.60 in amounts already received, and $27,199.49 in contributions and associated interest and liquidated damages removed from the audit findings due to being assessed on work later shown to be performed outside of the geographical jurisdiction of the Union; n. Additional interest on the delinquent contributions at the rate of ten percent (10%) per annum from October 12, 2026, through the date of judgment; o. Post-judgment interest at the statutory rate; and p. Any other relief the Court deems just and proper. See Brusseau Decl., ¶ 27; id., Exs. 2; Salvatierra Decl., ¶ 36, 45; id., Ex. 12; Richardson Decl., ¶¶ 12, 23-27; id, Ex. 4.

**Response:**

**Additional material facts supporting Defendants' anticipated cross-motion**

62. SIPS executed the MES renewal in November 2019 for an agreement effective October 1, 2019 through December 31, 2022. The renewal's recognition language refers to present and future job sites within Local 1's jurisdiction. ECF 66-3, at 1; ECF 66-4, Art. I, § 2.

63. Article I, § 1 of the MES agreement states: "This Agreement applies to Mechanical Equipment and Service Division work performed in the five counties which comprise the City of New York and any reference to Journeymen or Helpers shall mean, unless otherwise indicated, Journeymen and Helpers who perform Mechanical Equipment and Service Division work." The bargaining-unit provision identifies the same five-county jurisdiction. Article I, § 6 separately refers to "A" Building Trades and "Oil Trades" agreements when specified New Construction or Pump and Tank installations are performed. ECF 66-4, printed pp. 3–5.

64. Martino worked at SIPS's warehouse in Bohemia, New York, in Suffolk County, when not traveling out of state or working at New York job sites. His shop work included cleaning the shop, working on trucks, and loading and unloading trucks. He performed no plumbing work at that warehouse. Affidavit of Jay J. Martino, sworn July 26, 2023 ("Martino Aff."), ¶¶ 6–8.

65. Martino also traveled to job sites frequently located outside New York State. His pay stubs distinguished types of hours; his affidavit identifies "Shop Hours" generally as the warehouse work described in paragraph 64 and "On Site Regular" generally as work outside New York State. Martino Aff. ¶¶ 4–5, 9–11. Article II, Rule 7 of the MES agreement describes the trade work and its exclusions. ECF 66-4, printed pp. 7–8.

66. In calculating its expanded findings, the auditor included a group of 1,441.5 regular hours and 118 overtime hours recorded as shop, on-site, and NYC prevailing-wage hours. The stated basis included payment at a plumber wage rate and the auditor's conclusion that sufficient explanatory

documentation had not been provided. That combined group is not identified as exclusively shop hours. Brusseau Decl., ECF 66-17, ¶ 17; expanded final audit, ECF 66-19, at 6. The Welfare Trust provides that, where records are insufficient to determine covered hours, an employee who performed covered work is presumed to have spent the entire time doing so, unless other records establish the hours. ECF 66-5, Art. VI, § 5, at 24–25.

67. After reviewing additional time detail in April 2026, Plaintiffs' auditor identified work performed outside New York State as outside the geographical jurisdiction of covered work under the CBA. Brusseau Decl. ¶ 26; Salvatierra Decl., ECF 66-2, ¶ 34.

68. The auditor identified reductions of $14,328.70 in contribution principal, $5,200.65 in related interest, $2,624.58 in related liquidated damages, $3,322.07 in ASB-C findings, $1,059.07 in ASB-C interest, and $664.42 in ASB-C liquidated damages, totaling $27,199.49. Brusseau Decl. ¶ 27. Subtracting the conceded principal reduction from $74,514.77 yields $60,186.07 before other exclusions or payment allocation.

69. The expanded audit applies the classification "Plumber - AJ 1000." For January–June 2021, its summary lists 124.25 regular hours with $2,460.15 in welfare charges and eight overtime hours with $316.80 in welfare charges: $19.80 and $39.60 per hour, respectively. It lists $1,248.71 and $160.80 in employer 401(k) charges for those respective hours. ECF 66-19, at 7. MES Article IV(g) provides for straight-time overtime fringe contributions except the specified Target or United Association National Residential Agreement jobs, for which it provides time and one-half. ECF 66-4, printed p. 16.

70. SIPS signed an Agreement for Equipment Installation Work dated September 28, 2020 identifying 3119 Jerome Avenue, Bronx, with job duration September 1–30, 2020. The document states that the contractor is not required to participate in the Local 1 401(k) Plan and that amounts

otherwise payable to that plan shall be included in each employee's gross pay. It lists $21.71 for regular Local 1 fringe hours and $32.57 for overtime fringe hours. The copy's Union business-agent signature line is blank. "e agreement welkin.pdf," at 1.

71. The expanded audit seeks $21,619.30 in employer 401(k) contributions, $42,528.26 in welfare contributions, $3,717.70 in trade education contributions, $1,152.06 in promotion contributions, $4,510.11 in union assessment, $824.40 in organizing-fund charges, and $162.94 in PAC charges before later geographic reductions and payment credits. ECF 66-19, at 7, 27.

72. The National Pension Fund participation appendix addresses that named fund and includes a contribution provision for each hour or portion of an hour for which a covered employee is paid or entitled to payment for duties for the employer. The hourly categories listed in paragraph 71 do not include a National Pension Fund contribution. MES agreement, National Pension appendix, printed pp. 33–34 (ECF 66-4); ECF 66-19, at 7, 27.

73. MES Article II, Rule 3 requires a monthly shop card showing fringe payments for the previous month. Rule 9 contains separate on-call, call-out, travel, and return-of-vehicle compensation provisions. Article IV distinguishes employer fringe contributions from employee 401(k) deferrals and payments to employee accounts. Article X conditions union-assessment deductions on individual written authorization. Article II, Rule 4 calls the political-fund deduction voluntary and provides an authorization requirement. ECF 66-4, printed pp. 6–9, 15–17, 22–23.

74. Plaintiffs' damages summary totals $198,481.05 before subtracting $12,727.60 already received and $27,199.49 in geographic exclusions, leaving $158,553.96. The $198,481.05 includes $51,312.50 in attorneys' fees. ECF 66-16, at 1. Accordingly, the $158,553.96 figure also already includes that fee request.

75. Plaintiffs confirm receiving the $12,727.60 payment on February 2, 2026. Their interest schedule describes applying it to the oldest outstanding contributions and stopping interest on those amounts at the payment date. Salvatierra Decl. ¶¶ 33, 43; ECF 66-16, at 2. The expanded final audit separately lists $18,067.33 as additional outstanding delinquencies on file with the Fund Office. ECF 66-19, at 29.

76. Plaintiffs seek $2,000 in administrative fees and $11,382.35 in audit costs in the current damages summary. ECF 66-16, at 1. The fringe-benefit collection policy's audit-cost provision uses the lesser of two percent of total payroll for covered employees for the audited period or $25,000. ECF 66-8, Art. IV, ¶ 8. The MES agreement also contains a reasonable audit/accounting-cost provision. ECF 66-4, Art. VI.

77. The audit-production stipulation provides that the employer will pay any undisputed contributions determined due, preserves rights and defenses, disclaims wrongdoing and admissions, and restricts evidentiary use to enforcement of its terms. It also preserves the December 31, 2022 termination and disclaims reinstatement of a CBA through the agreed audit and reporting acts. ECF 66-30, ¶¶ 1–4.

78. The collection policy gives the employer a preliminary-audit objection and review procedure, followed by a final report, a payment demand, and possible litigation. ECF 66-8, Art. IV, ¶¶ 3–7. Counsel's October 5, 2021 letter addressed to the Funds reports remittance-system problems and an earlier payment submission. October 5, 2021 letter to the Joint Plumbing Industry Board, at 1.

79. Bond No. 810002719 dated July 1, 2020 states a $7,000 penal sum and that the surety's aggregate liability for all or any defaults shall not exceed the bond's penalty. The rider changes the amount to $21,000 effective February 18, 2021 and preserves other terms. The bond's

cancellation provision preserves obligations accrued before cancellation becomes effective. ECF 66-12, at 1–2; ECF 66-13, at 1.

80. The parties' September 25, 2026 joint letter describes the remaining SIPS corporate deposition and their request to defer it pending settlement efforts. ECF 64, at 1–2. The October 1, 2026 order sets a December 7, 2026 settlement conference and adjourns the discovery-completion deadline sine die, with a new completion proposal if settlement fails.

Dated: Jamaica, New York
October 13, 2026

Respectfully submitted,

**SAGE LEGAL LLC**

/s/ Emanuel Kataev, Esq.
Emanuel Kataev, Esq.
18211 Jamaica Avenue
Jamaica, NY 11423-2327
(718) 412-2421 (office)
(917) 807-7819 (cellular)
(718) 489-4155 (facsimile)
emanuel@sagelegal.nyc

*Attorneys for Defendants*